In re D. FEDERICO CO., INC., Debtor.

D. FEDERICO CO., INC., Plaintiff,

v.

NEW BEDFORD REDEVELOPMENT
AUTHORITY, Defendant.

Bankruptcy No. 79–2289–HL.
Adv. Nos. A80–0124 to A80–0126.

United States Bankruptcy Court,
D. Massachusetts.

Feb. 3, 1981.

Lewis C. Eisenberg, Cosgrove & Eisenberg, Quincy, Mass., for plaintiff.

Raymond A. Letourneau, Letourneau & Letourneau, New Bedford, Mass., for defendant.

## MEMORANDUM ON PROSPECTIVE LIABILITY

HAROLD LAVIEN, Bankruptcy Judge.

*PROCEDURAL POSTURE*

These cases are presently before the Court by virtue of an Order of Removal issued by this Court on October 1, 1980. The Plaintiff, D. Federico Co., Inc., an Order for Relief having been issued on September 18, 1980, is seeking monies due on account of construction work performed by the Debtor on three public contracts. Since there was no chance of an expedient resolution in State Court, this Court removed the actions from the Norfolk Superior Court pursuant to 28 U.S.C. §§ 1471 and 1478 and the Court's mandate of expedient administration of debtors' estates. *Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966).

The Plaintiff in this case, a general contractor, was awarded five public contracts by the Defendant, New Bedford Redevelopment Authority (hereinafter Authority) involving the construction of storm drainage, sanitary sewers, water mains, curbs, sidewalks, new pavement, pavement resurfacing and other related work. Three of those contracts are presently before the Court. The three are: South Terminal Urban Renewal Project (hereinafter South Terminal project), North Terminal Urban Renewal Project (hereinafter North Terminal project) and West End Urban Renewal Project (hereinafter West End project).

Plaintiff's complaint is comprised of five counts, as follows: Count I is a claim for extra fittings and adapters used in the installation of underground piping as a result of unanticipated underground obstructions due to the inaccurate depiction of such obstructions on the drawings of the Authority. This count is based on breach of contract, as plaintiff alleges that the Authority authorized the use of the extra fittings but has not paid Plaintiff as per the alleged authorization. Counts II and III seek damages for the extra fittings and adapters as in Count I but based on a contract implied in fact (Count II) and a contract implied in law, quantum meruit (Count III). Count IV is a claim for final measurements, final payments, interest as permitted under M.G.L. Ch. 30 § 39G and the release of retainages held by the Authority. Count IV of the West End complaint is for damages for a scribner's error in that contract for the bid price of some stone curbing. Counts V and VI of the West End correspond to Counts IV and V of the other two cases. Count V seeks damages for fittings and adapters as in Count I, but is based on a breach of warranty of accurate disclosure because of the failure of the Authority's drawings to depict the proper location of underground obstructions with the Authority knowing that Plaintiff would rely on the drawings in determining its bid and also knowing that it was impossible for Plaintiff to confirm the exact location of the existing utilities.

The Authority denies the allegations of each count of Federico's complaint and alleges twelve defenses to the complaint. These defenses in general state that plaintiff failed to conform to the requirements of the written contract between the parties which required written notice and authority for any changes in work, as well as written requests for extra costs, and that the contract entered into between the parties was an express contract which limited Plaintiff to the remedies allowed under the terms of

the contract. Defendant denies the existence of a contract implied in law or fact. Defendant also counterclaims against the Plaintiff, claiming liquidated damages for delays in completion of the various projects.

Prior to trial, the Court ruled on Defendant's Motion for Summary Judgment. The requested motion was denied with respect to all of the technical counts of Plaintiff's complaint, except for the limited issue of whether the Defendant's chief engineer and its on-site engineer had any type of authority to orally alter the terms of the contracts. The Court ruled in favor of Defendant's motion on this limited issue. However, since the factual issues involved in that one issue are similar to other issues involved in Plaintiff's complaint, I allowed evidence on whether defendant's engineers had authority to vary the terms of the contract.

*THE FACTS*

The Plaintiff learned of the open bidding on the Site Improvements from an advertisement in trade journals in January, 1973. Upon learning of the bids, Plaintiff requested, and did receive from the Authority, contract specifications and drawings for each project. The plans and specifications for the South and North Terminal projects were prepared by Goodkind & O'Dea, an independent engineering company; and, for the West End project, by Meridian Engineering Company, also an independent firm. Although the drawings for each contract indicated locations of proposed new construction and locations of existing improvements, such as electrical distribution, telephone distribution, sanitary and storm drainage, water distribution, roadway and curbing, the Instructions to Bidders, which were sent out with each set of plans contained a clause which warned prospective bidders to visit the sites to become acquainted with on-site conditions.[1] In addition, the Technical Specifications for Cast Iron Water Mains and Appurtanances provided in part, that "the location of existing underground utilities and structures as shown on the Drawings is approximate only and is shown only for the convenience of the contractor who must verify the information to his own satisfaction." In preparing the plans, both engineering firms performed topographical surveys, and inspected maps and drawings of private and public agencies including records of installation of utilities. In addition, the engineers submitted the plans to the utility companies and the water and sewer departments of the City of New Bedford to have the locations of existing utilities verified. In short, I find as fact that the design engineers prepared the drawings from the best information available and did everything feasible to accurately depict existing utilities. Neither the design engineers, the bidders, nor the Authority could do anything more to ascertain the obstructions without the actual excavation. All parties were aware of these limitations on the drawings. Bidders were told that they could only rely on the approximate locations of the existing underground utilities as depicted in the drawings at their own peril, and the Authority did all it could be expected to do to bring that fact home to all bidders.

The plans for each contract depicted the location for the placing of new pipe and the bidder could judge the approximate number and type of fittings by matching the pipe to the obstructions. Fittings are connections between pipes including elbows, bends, crosses or reducers which enable the pipe to change directions. The bid for each contract was by numerous line items for which the Plaintiff would prepare a unit price. There was no separate line item for fittings and adapters. The bid for line items for piping was intended to include any necessary fittings. The Plaintiff would determine the overall bid price for piping by doing a "take-off" from the plans. A "take-off" involves examining the plans to determine exactly what length of each size of pipe and where a fitting would appear to be needed. Plaintiff submitted sealed bids

---

1. *See* Appendix A for the relevant exculpatory clauses set out in the plans, specifications and contracts.

for each contract containing within it the line items for piping, which was expected to include the cost of piping and the cost of fittings and adapters. Fittings comprised a very small percentage of the pipe line item [2] and compensation for extra fittings was tied to the need for extra pipe, if any was used. If there were no obstructions encountered, Federico would have actually used less fittings, but would not have been compensated any less, since their cost had already been calculated in the line item cost for piping. Even for the piping, itself, the contracts provided for a 25% variation without a reduction or increase in the contract quantity estimates.[3] The dates of submitting and opening of the bids were February 2, 1973 for South Terminal, June 1, 1973 for North Terminal and October 26, 1973 for West End. The Plaintiff was awarded the contract for South Terminal on March 7, 1973, for North Terminal on July 16, 1973 and for West End on December 27, 1973. Installation of piping on the South Terminal began in March, 1973. The Plaintiff's field superintendent, Robert Field, and Plaintiff's project manager became aware of underground obstructions which were not as depicted on the plans by the end of April, 1973. Plaintiff's engineers testified that they informed Defendant's resident engineer, Anton Brockelman, and its chief engineer, Manuel Viveiros, of the problems. Although Plaintiff had been dealing almost exclusively with the Authority's executive director, (at first, this was Mr. Baptista, later succeeded by Henry Horn, who had been assistant executive director), no notice of the problems were given to either of them by the Plaintiff, and there was no evidence that they were unavailable to receive notice. The Debtor's witness testified that both Brockelman and Viveiros orally instructed Federico to proceed with the work and to keep track of any extra fit-

tings. Despite the provisions of the contract requiring changes and extras to be approved of in advance and in writing,[4] Federico proceeded with the installation involving the alleged extra or change without any attempt to notify the Authority in writing or to obtain its written approval. The installation of pipe on the South Terminal project was from April to December, 1973.

In May of 1973, Plaintiff prepared its bid on the North Terminal. By his own testimony, Capocefalo, who was in charge of bid preparation for the Plaintiff, already knew of the unanticipated underground obstructions found on the South Terminal job, but his knowledge had no effect on his bid preparation on the North Terminal. Capocefalo gave two reasons for this. The first was that since other bidders had no knowledge of the problems, Federico's bid would have been too high if it based its price on the likelihood of undepicted underground obstructions. Second, that he was reasonably assured from conversations with the Defendant's on-site engineer that he would be paid for any extra fittings on the South Terminal and felt the Defendant would do likewise on the North Terminal. Plaintiff was awarded the North Terminal contract, which was substantially the same as the South Terminal contract, on June 1, 1973. Piping work began in July, 1973 and ended in June, 1975. Shortly after July, 1973, the same problems arose as on the South Terminal. Namely, that unanticipated obstructions from existing utilities were encountered and that Federico again testified that he was instructed orally by both the chief engineer and the resident engineer of the Defendant to proceed as quickly as possible by going around, under or over the obstructions. In October, 1973, Plaintiff prepared a bid for the same underground piping work on the West End project. Claiming

2. Specifically, on the South Terminal project, pipe was bid at between $18. and $26. per linear foot, of which $3.64 covered the cost of fittings and adapters. On the North Station project, pipe was bid at between $15. and $51. per linear foot with $2.98 covering the cost of fittings. On the West End project, pipe was

bid at between $18. and $46., of which $2.59 reflected the cost of fittings and adapters.

3. See Appendix B.

4. See Appendix B for relevant provisions with respect to changes and extras.

that it would have been conjecture to base a bid on the possibility of encountering undepicted underground obstructions, a bid was prepared without such possibility being taken into account. The contract was awarded to Federico on December 27, 1973. Piping work on the West End project began in January, 1974 and, by the end of the month, the same problems occurred with unexpected underground utilities as with the other two projects. The piping work was completed by December 1975. Again, Federico testified that they were orally instructed by the Defendant's on-site engineer to proceed with piping.

Plaintiff has not been paid for any excess fittings in any one of the three projects.

The Debtor's witnesses testified that on all three projects, Viveiros and Brockelman told them to proceed with the work, keep track of the extra fittings, and they would be paid for them. Neither of the engineers testified. There was no evidence offered that the engineers had the authority to create a new line item or of their authority to waive the explicit contract provisions dealing with extras including the 25% leeway provision and, in fact, no claim was made for an extra for fittings, either under the contract provisions or based on any authority of the engineers, either real or

apparent, until January 26, 1977, just one month prior to this litigation and approximately two years after all of the work involved with the fittings had been completed. This is also the first date there was any evidence that the executive director, who was always available and on the site weekly, had any knowledge that a claim for extra fittings was being made.[5] At this point, there was no opportunity for verification of the claim without re-excavating the entire three projects and, certainly, without an opportunity to meaningfully object to a waiver of the explicit contract provisions for processing claims for extras. To the extent that it still may be material, and despite my previous allowance of summary judgment, the Debtor offered its unobjected to evidence on authority, and I find it failed to sustain its burden of proof. I find as a fact that the Debtor has failed to prove any real or apparent authority in either Viveiros or Brockelman to waive the contract provisions on extras or to create new line items.

In preparing Federico's bid on the West End project, Capocefalo computed a bid work-up on line item 44, granite curbing, of $4.51 per linear foot as the actual cost of granite curbing. The final unit price, according to Capocefalo, was to be $8.00[6] per

---

5. While the evidence indicates that Horn was aware of the fact that unanticipated obstructions were being encountered as early as November 6, 1975, the first time he was aware that Federico planned to make a claim for the cost of the alleged extra fittings was the January 26, 1977 letter. There were three documents introduced into evidence by the Debtor in support of its position that the Authority knew of the use of extra fittings and in fact authorized such use. These documents, Extra Work Report for the South Terminal job, and Summaries of Excess Fittings for the North Terminal and West End projects do little to advance the Plaintiff's position. None of them are dated; the Summaries of Excess Fittings are nothing more than a list of figures on a price of scrap paper with no indication that a claim for extras is being made pursuant to the contract. The Extra Work Report purportedly itemizes the alleged extra fittings used from March—December, 1973. The testimony indicates, however, that the earliest time for the delivery or pickup of any fittings occurred on May 2, 1973. More importantly, however, the executive director denies knowledge of these

lists and I find that he was not aware of them. In any case, I find that these lists were not the type of writing which the contract contemplated as sufficient to entitle the contractor to extras.

The appropriate manner of requesting a change order for extras is illustrated by Change Order # 1, issued by the Authority on November 6, 1975 and signed by the Authority's executive director, is in the form of a writing which comports with the contract requirements for prior written approval of changes and extras. Moreover, it clearly establishes that Federico knew of the contract requirements and complied with them at lest on this portion of the North Terminal project. It should also be noted that Federico did not rely on oral extensions of the completion dates under its various contracts but sought and obtained written extensions.

6. While it was apparent that $.08 was an error, it was not clear as to what the price should have been. The same granite curbing was used in the other two contracts with bids of $6.10 and $6.50.

linear foot. Capocefalo testified that as a result of his clerical error or transposing the figure from his work-up to the bid document, the final sealed bid submitted to the Authority for the West End project showed a bid price for line item 44 of $.08. Testimony indicates, and I so find, that Capocefalo was told of the apparent mistake by the Authority and was given the opportunity to withdraw his bid without forfeiting his bid bond because of the mistake. Capocefalo testified that because he feared having to forfeit his bid bond if he withdrew the bid, he chose to accept the contract with the unit price of granite curbing at $.08 per linear foot. This, however, cannot be correct since the amount lost on the bid bond would have been $170,000. (5% of the total contract price of $3,416,991.) while the amount lost by using a bid price of $.08 instead of $8.00 would have been approximately $370,000. Clearly, if the only consideration was the potential loss, it was cheaper to lose the deposit than to continue with over twice the loss. Federico must have felt that despite the loss on the curbing, there was enough potential profit in the job to absorb the mistake, especially since the Authority was exhibiting its good faith not only in allowing him to withdraw without penalty but in working to reduce the hardship by very substantially increasing the allowed use of old curbing. I also find that the Authority, at least partly to compensate Federico for this error, allowed Federico to use curbing that was previously removed from another part of the job site. Specifically, the Authority allowed Federico to use approximately 37,000 linear feet of reused curbing at $5.00 per linear foot while it required the use of only 14,000 linear feet of new granite at $.08 per linear foot. The Authority had originally estimated that there would be 47,000 feet of new granite curbing used, and only 10,000 feet of reused curbing.

At the point of substantial completion of each contract, the Authority was contractually required to conduct a final inspection of the job. From this inspection, the Defendant was to derive a final punch list indicating deficiencies needed to be completed by the Plaintiff. After receiving the final punch list from the Authority, and completing the work indicated, the Authority was to complete a measurement to determine the amount of pipe used as the basis for a possible extra which would, since the piping unit price included fittings, be one appropriate manner of receiving an extra. The Plaintiff was to then have all retainage held by the Defendant released as well as to receive final payment.

According to the testimony, and I so find, the South Terminal project was substantially complete by April, 1975. However, Federico has still not received either a final measurement nor final payment, nor a release of any retainages still being held by the Authority. The same is true on the North Terminal and West End projects, which were substantially completed by the end of May, 1976. Finally, a punch list was received from the Authority's counsel on December 22, 1977, after litigation had begun, covering work to be done on all three projects. Subsequent lists of additional work were received on the West End job. However, for the purpose of this case, the December 22, 1977 letter is considered the final punch list and completion and allowances will be based on the same. The Authority may well be able to substantiate its claims for those additional items under either a warranty or defective original work. Since requests for punch lists were not answered within a reasonable time, the Court considers the projects, for the purpose of any late completion penalties, fully complete as of the dates of their substantial completion and no penalties for late completion would be allowed since, in each case, the date of substantial completion was within the extended contract completion date. For the purpose of determining any deficiencies in completion, the effective date will be December 22, 1977, the date of the punch list from counsel for the Authority. Why the Authority was so dilatory in supplying a punch list to either the Debtor

or its bonding company was never really answered and presents somewhat of a puzzle. However, it is undisputed that requests for the same went unanswered.

## A. *Plaintiff's Warranty Claim for Fittings*

■ Plaintiff claims that despite the numerous and conspicuous disclaimers on the part of the Authority for liability for the location of underground obstructions, see Appendix A, Plaintiff should nevertheless be able to recover under a theory of breach of warranty of accurate disclosure. Such a warranty exists in certain situations. In *M. L. Shalloo, Inc. v. Ricciardi & Sons Construction, Inc.*, 348 Mass. 682, 205 N.E.2d 239 (1965) the Massachusetts Supreme Judicial Court held that if a boring report misrepresented actual soil conditions, and the contractor was reasonably expected to rely on the report, *and there was no indication of any warning to the contractor not to rely on the report*, then, under these circumstances, there could be a breach of warranty for which the contractor would recover. This case is inapplicable to the case at bar since here, there were as laid out in the appendix of this opinion, numerous and conspicuous warnings to the Plaintiff not to rely on the location of underground obstructions as depicted in the specifications and drawings. Counsel for the Debtor-contractor cites two Supreme Court cases as lending further support to its claim. The first is distinguishable on its facts, and the second actually supports the Authority. In one, *Hollerbach v. United States*, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914) the Court stated that even where there is exculpatory language similar to the disclaimer in the instant case, the government must bear liability for making a specific representation as to the exact number of feet of a certain type of soil, when it turns out that the actual number of feet and the type of soil represented to exist, is wrong.[7] In *Hollerbach*, the Court concluded that both sides could easily have made independent investigations to determine the true nature of the subsurface conditions. Therefore, the Court found that the government was bound by its representations since they "assured [the contractor] of the character of the material,—a matter concerning which the government might be presumed to speak with knowledge and authority." *Id.* at 172, 34 S.Ct. at 556. Here, the Authority made no representation as to the specific number of fittings to be used. The plans and specifications indicated where piping would have to be laid and left it to the bidder to deal with fittings as an incidental part of the piping unit price. Plaintiff, by doing a take-off would then be able to approximate the number of fittings that would eventually have to be used. Against this calculation, Plaintiff had the continuing reminder not to rely on the location of existing underground utilities. Unlike the *Hollerbach* case, the Authority here made no specific representation, exact or even approximate, as to the exact number of fittings that would be needed and, therefore, it cannot be held liable for a breach of adequate disclosure. Moreover, the Authority could not have determined the true nature of the subsurface conditions. Such an investigation would have required a complete excavation of the areas to determine whether the underground obstructions were depicted accurately. Therefore, unlike *Hollerbach*, the Authority here clearly indicated that the location of existing obstructions were approximate only and invited bids based on this disclaimer. In this case, the Authority certainly did not "speak with knowledge and authority." See *Hollerbach, Supra*, at 556.

Plaintiff's reliance on *Christie v. United States*, 237 U.S. 234, 35 S.Ct. 565, 59 L.Ed.2d 933 (1915), is likewise misplaced. In that case, the Court held that the government should not bear liability for additional costs and materials incurred by

---

7. The government set forth the following representation in the contract in *Hollerbach*: "The dam is now backed for about 50 feet with broken stone, sawdust and sediment, to a height within 2 or 3 feet of the crest ...". *Id.* at 171, 34 S.Ct. at 555. As it turned out, not only were the number of feet involved misstated, but the dam was backed not by broken stone and filler, but by solid stone.

the contractor because of the government's use of a different angle for excavation due to unanticipated natural conditions.

We do not think, therefore, that there is anything in the contract which cast upon the Government a prophecy and anticipation of abnormal conditions or which relieved claimants from the risks of their occurrence or of whatever they might encounter in the work. *It is to be supposed that contemplation and judgment were exercised not only of certainties but of contingencies and allowance made for both at the time of bidding, with provision in the bid.* *Id.* at 245, 35 S.Ct. at 568. (emphasis added).

In the present case, the Authority clearly intended that bidders exercise their judgment "not only of certainties but of contingencies", and that "allowance [be] made for both at the time of bidding." Its intent in this regard is clearly reflected by both the disclaimer language and the fact that fittings are nowhere indicated as a line item. Rather, it is anticipated that fittings are to be an incidental part of the price bid and paid for piping. To the extent that final measurements indicate extra piping it will be paid for consistent with the 25% limitation.

At first blush, *Robert E. McKee, Inc. v. City of Atlanta*, 414 F.Supp. 957 (N.D.Ga. 1976) would appear to support plaintiff's position. However, when considered against the backdrop of the facts of this case, it is inapposite. In *McKee*, similar to this case, the Court denied the motion for summary judgment. Here, we had a full evidentiary hearing and on all the facts there was neither a material misrepresentation nor the justifiable reliance necessary for a breach of warranty claim.

■ As stated in *McKee*, the government in public contracts does not become an insurer by providing the best available information. The cases limit, as they should, liability to situations where the government makes available *positive specifications* that are not only inaccurate, but that could have been accurate, intending them to be used by contractors in formulating their bids. In

those cases, general exculpatory clauses which disclaim any responsibility for the accuracy of the data have been held to be of no effect. *See Hollerbach, Supra.*

■ The Authority, in this case, never intended the plans and drawings to be positive specifications, as is amply shown by the specific, not general, disclaimer language that was replete throughout the plans. There really does not appear to be anything further the Authority could have done and, in fact, when the Court put the question to counsel, he could provide no answer. In counsel's view, there was no way the Authority could present a request for a bid intending to disclose all the facts as it knew them, ask for bids on those facts and have the bidders calculate the risks in their bids. If, after including this disclaimer language and making piping and fittings one line item, the Authority is still held to a breach of warranty of accurate disclosure, then it would seem that public agencies would become insurers against any unanticipated construction complications no matter how they tried to protect themselves against such a role. Such a role would defeat the entire purpose of letting out bids for community projects to the public; namely, the procurement of construction projects at the least possible cost to the taxpayer. I find that the Authority properly disclaimed any warranty of accurate disclosure and, therefore should not be, and is not, liable for the cost of extra fittings on the South Terminal, if there were any, and, in any event, fittings were not intended to be an item of cost.

■ On the North Terminal and West End projects, the lack of justifiable reliance is even clearer. The Plaintiff prepared his bids for both of these projects with the knowledge that despite the Authority's best efforts, and it in fact made all reasonable efforts to be accurate, it could not accurately locate all underground obstructions and the Plaintiff knew that from the unanticipated underground obstructions already encountered on the South Terminal project. By the time the third bid was prepared,

Plaintiff had run into the same problem twice before. Yet, for each bid preparation, Capocefalo testified that the knowledge of these problems had no effect on his bid preparation. Clearly, for the North Terminal and West End projects, the Plaintiff could not, in good faith, claim to have justifiably relied on the plans and specifications provided by the Authority. "The state is not liable for conclusions drawn by a bidder when the state has done little more than represent the results of its investigations and the bidder knew or should have known of the factual bases for the representations." *McKee, Supra, citing Wunderlich v. California*, 65 Cal.2d 777, 56 Cal.Rptr. 473, 423 P.2d 545 (1967). Thus, for the last two projects, North Terminal and West End, I find that Plaintiff could not justifiably rely on the drawings and specifications of the Authority as being any more than what they purported to be; namely, the Authority's best approximations of the locations of the various utilities which would constitute obstructions in laying the new piping and, therefore, "the contractor may not claim in the face of a pertinent disclaimer that the presentation of the information ... amounts to a warranty of the conditions that will actually be found." *Id.* 56 Cal.Rptr. 478, 423 P.2d at 550.

Having found that the Authority did not breach a warranty of accurate disclosure, the next task confronting the Court is whether there can be a contractual recovery either under the contract or in spite of the contract under a theory of contract implied in law or in fact. Recovery for extras under the contract hinges on the contractor's showing that it had complied with the notice and writing requirements and with other applicable contract provisions. Without such a showing, and Plaintiff admits that it did not conform to the relevant contract provisions, in order to recover the Court must find that the Authority had waived or excused compliance with the necessary formalities. *Glynn v. Gloucester*, Mass.App.Ct.Adv.Sh. 605, —— Mass. App. ——, 401 N.E.2d 886 (1980). A contract implied in fact is a true contract containing all the necessary elements of a binding contract. It differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of parties in the milieu in which they dealt. *Bloomgarden v. Coyer*, 479 F.2d 201 (D.C.Cir.1973). Although an implied in fact contract may be inferred from facts and circumstances of a given case, the law will not imply a promise contrary to the express intention of the party to be charged. *Crosby v. Paul Hardeman, Inc.*, 414 F.2d 1 (8th Cir. 1969); *Security Life & Acc. Ins. Co. v. United States*, 357 F.2d 145 (5th Cir. 1966). Here, unless the Court finds a waiver, the express provisions of the contract would prevent the Court finding a contract implied in fact that would be contra to the contract requirements dealing with extras and modifications. Contracts implied in law, or quasi-contracts, are not really contracts at all, but a duty, thrust under certain conditions, upon one party to compensate another in order to avoid the former's unjust enrichment. *Bloomgarden, Supra.* Generally, to recover on contracts implied in law, Plaintiff must show that Defendant was unjustly enriched at Plaintiff's expense and that circumstances are such that in good conscience, Defendant should make restitution. *Id.* However, recovery on a theory of contract implied in law is not permitted, at least in the absence of bad faith, where an express contract covers the same subject. *Randolph v. New England Mutual Life Ins. Co.*, 526 F.2d 1383 (6th Cir. 1975). Thus, on any of the contract theories the Court must find that the contract provisions dealing with changes and extras were effectively waived by the Defendant in order to allow recovery and the Court does not so find.

In Massachusetts, a contract provision requiring the written order of a housing authority for extras, may be waived. *McGovern v. Salem*, 214 Mass. 358, 101 N.E. 974 (1913); *Costonis v. Medford Housing Authority*, 343 Mass. 108, 176 N.E.2d 25 (1961); *Powell's General Contracting Co., Inc. v. Marshfield Housing Authority*, Mass.App.Ct.Adv.Sh. 1227, ——

Mass.App. ——, 390 N.E.2d 267 (1979). The existence of apparent authority in agents of such public bodies to waive the writing requirement, however, is not readily assumed. *Costonis v. Medford Housing Authority, Supra.* Authority of an agent is a question of fact. In deciding the issue, courts can draw inferences from a variety of circumstances relating to the conduct of the apparent agent, and whether the circumstances are such as to warrant persons dealing with him, in the exercise of reasonable prudence and discretion to believe he has the authority to represent the alleged principal. *Costonis, Supra*, 343 Mass. at 113, 176 N.E.2d 25; *Bond Pharmacy, Inc. v. Cambridge*, 338 Mass. 488, 491, 156 N.E.2d 34 (1959). In *Costonis*, the circumstances which led the court to find that the Authority's agent had the apparent authority to waive the contract included the following:

The name "Gerald A. Palumbo Executive Director" was the only one appearing on the letterhead of the Authority; his is the only name appearing on the "Invitation for Bids"; the "Invitation for Bids" was made a part of the contract; he made inspections while the work was in progress; he was the "Contracting Officer" with authority "to administer the contract for and in the name of the Medford Housing Authority"; he was the man the Plaintiff spoke to about the materials to be used on the job; he was the man who wrote and signed all correspondence directed to the Plaintiff from the Authority.

None of these factors existed in the present case. Plaintiff had, throughout the bidding procedure and contract negotiations, dealt with the Authority's executive director or his assistant. Plaintiff, as an experienced general contractor should have known that authority for any changes from the contract would have to come from, at least, the executive director, not its field engineer. In addition to its previous experience, Plaintiff was certainly aware of the contract provisions requiring all changes to be in writing and the required procedures. There was evidence offered to show that Plaintiff had complied with these provisions for other changes on the same contracts.[8] From all of the evidence, the court finds as fact that the executive director of the Authority was not informed of the alleged use of extra fittings, or that the lists of extra fittings, which the Plaintiff claims to have kept, were brought to the attention of the executive director or to the Authority before January 26, 1977, the work having been completed at least two years before, and the job sites having been completely filled in and resurfaced. It was then too late for the Authority to object, suggest alternatives, or even verify the claims.[9] There was no evidence that it was brought home to the executive director or the Authority that any claim for extras was being made for any non line item such as fittings before January 26, 1977, and I find that they had no such knowledge. For the Court to find that Defendant's agent had the authority to waive the writing requirements of the contract, it must, at a minimum, be able to find that the Defendant was aware of the additional work and was involved in it, i. e., it provided the additional materials. *McGovern v. Salem*, 214 Mass. 358, 101 N.E. 974 (1913). Moreover, it is incumbent on the contractor to show that there was clear, decisive, and unequivocal conduct on the part of an authorized representative of the agency indicating that it would not insist on adherence to the agreement. *Glynn v. Gloucester, Supra*, at 613, —— Mass.App. at ——, 401 N.E.2d 886. There was no evidence offered to indicate the non-availability of the executive director; on the contrary, the evidence was of his weekly availability and, yet, no waiver was sought from him. I find that the Plaintiff has failed to sustain its burden in this regard and, accordingly, I find that the engineers had neither real nor apparent authority to waive the contract provisions or to create new line items. There was not an effective waiver of the contract provisions requiring advance written authorization

---

8. See note 5, *Supra.*

9. See note 5, *Supra.*

from the Authority prior to the Plaintiff's varying the terms of the contracts. The cost of the additional fittings, if indeed there were any, therefore, must lie with the Plaintiff. Except, of course, insofar as in the final measurements they would be included as was intended in the allowance for any additional piping.

■ Plaintiff's claim for an equitable adjustment under M.G.L. Ch. 30, Section 39N could, as Plaintiff concedes in his Reply Memorandum, apply only to the South Terminal project since that is the only project for which there is any evidence indicating that an extra work report had been prepared.

This document, Ex. S–8, which itself is undated, purportedly covers the period March through December, 1973, and was allegedly prepared by Field but with no evidence of when it was prepared except that it was, obviously, after all of the work had been performed. I note by contrast that Exhibits S–11 A, B, & C, which are daily extra work reports also prepared by Field, contain no mention of extra fittings on these reports dated and prepared at the time the purported extra fittings were being used. The Authority denies having received Ex. S–8 and, in fact, the copy produced by Federico is a photostat and not either the yellow or blue copies that, under Federico's office system, should be in their file. The Plaintiff testified that Brockelman, the resident engineer, discussed Ex. S–8 with them but when it was received by him or even when the discussion took place, is as vague as being sometime after it was prepared, sometime after December, 1973. Normally, the party asserting the affirmative of a proposition should bear the burden of proving that proposition. *Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575 (1st Cir. 1979). M.G.L. Ch. 30, Section 39N requires the party seeking an equitable adjustment to deliver such claim to the other party as soon as possible after the actual conditions were discovered. I find that Federico fell short of proving its compliance with M.G.L. Ch. 30, Section 39N. Federico has not sustained its burden of proving that a written request for an equitable adjustment was submitted as soon as possible after Federico discovered the actual subsurface conditions. There was no writing on the West and North projects until January 26, 1977. On the South project, I do not find that Ex. S–8 qualified as proper notice under M.G.L. Ch. 30, Section 39N, in that at best, it was not timely delivered to the Authority. Federico has totally failed in its burden of proving that it delivered its request to the Authority "as soon as possible" after discovering the actual subsurface conditions. There was not even a mention of extra fittings in the daily extra reports, Ex. S–11. Certainly, he who seeks equity must do equity.

■ Plaintiff claims that due to a clerical error, the bid which was submitted for line item 44, granite curbing, was $.08 per linear foot instead of the intended amount of $8.00 per linear foot. If this was the only evidence on the issue, the Court might have grounds for supporting a reformation of the West End contract. But even then, however, Plaintiff would have substantial problems in proving that $8.00 was the appropriate value since the Plaintiff concedes that both of the other contracts used the same curbing and their bid prices were for $6.50 and $6.10 per linear foot.

In any event, I find that the Plaintiff was made aware by the Authority through the executive director of its mistake prior to signing the contract. Testimony shows that both Viveiros and Horn notified the Defendant that there was an error in line item 44. What's more, the Authority gave the Plaintiff the opportunity to withdraw its bid. The Authority did not stop here, though. It allowed the Plaintiff to use approximately 37,000 feet of used granite curbing at $5.00 per linear foot to recoup some of its potential loss on the line item, instead of the called for 10,000 feet; and it *reduced the required new curbing from 47,-000 to 14,000 linear feet.*

Thus, clearly there is no mistake here, nor is there a clerical error, since Plaintiff ratified the line item at $.08 per linear foot. Plaintiff is, therefore, not entitled to a ref-

ormation of its contract with the Authority. *Lincoln Sudbury Regional School District v. Brandt-Jordan Corp.*, 356 Mass. 114, 248 N.E.2d 477 (1971); M.G.L. Ch. 149, Section 44B(2).

As far as the three projects are concerned I have already found the substantial completion dates to be April, 1975 for the South Terminal, and May, 1976 for the North Terminal and West End projects.[10] Since the Authority failed to make a final inspection or to provide a final punch list within a reasonable time to either the Debtor or its surety after repeated demands for the same, the Court considers the projects complete as of their substantial completion dates. The letter of December 22, 1977 from the Authority's counsel to the Debtor's counsel, is, for the purposes of this case, found to be the final punch list for all three projects. Thus, the Authority will be allowed to deduct the costs or value of any of the items on the "punch list", subject to the Court's finding that they have not since been completed. In addition, the Authority may have complaints for defective work or warranted work, or work needed to be done on the West End project as per the letter of March 3, 1978 from the Authority to Federico and its surety, also subject to the Court's findings as to which of the items on that letter were not done by Federico or, alternatively, was not its responsibility. Based on the evidence, including the Authority's board minutes, I find that the three paving projects listed on the December 22, 1977 letter concerning the South Terminal project were either completed by Simione, a subcontractor, in March of 1978 or, if not completed, those items were no longer Federico's responsibility.

On the North Terminal project, I find that the electrical work on the pump station, as described in the final punch list, was performed prior to November, 1978, by Rittenberg, the electrical subcontractor, who was paid by the surety.

The telephone duct work and the clearing of manholes were completed in March, 1978.

Whether or not the fire alarm work was completed, I find that it was not the responsibility of Federico and, therefore, the Authority may not withhold any money from Federico for this item. Likewise I find that the blocked electrical ducts and the repair of the sidewalks were not the result of anything for which Federico was responsible and, therefore, their costs of completion may not be deducted from the amounts due Federico.

On the West End project, I find that Federico was responsible for, but failed to complete, both the locating of the ten water service gates and the installation of four fire alarm pedestals. The locating of two manholes, the construction of six brick inverts and the repairing of the settlements in the roadway, I find to have all been completed.

As on the North Terminal project, I find that the unblocking of the electrical ducts was not Federico's responsibility.

As far as the subsequent three-page list of work needed to be done, submitted by the Authority to both the Debtor and its surety on March 3, 1978, I find that the Authority had previously represented to the Plaintiff and the surety, that all of the paving items on that list had been satisfactorily performed by the Lisbon Construction Company. Such representations were made in a December 2, 1977 letter to the surety, and earlier, in open court. These representations were, in large part, the reason why the surety was ordered by the Bristol Superior Court to pay Lisbon for the paving work performed by it. Thus, the Authority is now estopped from making a claim for those items of paving and curbing against Federico or its surety.

---

**10.** At the Authority's board meeting of November 18, 1974, it was reported that Federico was 99.2% completed with its work on the South Terminal project and 95.1% completed with its work on the North Terminal project. Both progress reports were unanimously accepted by the Board. At the Authority's board meeting of January 5, 1976, it was reported and unanimously accepted that Federico was about 98% complete with its work on the West End project. The actual dates of substantial completion used are the later dates testified to by Federico.

█ As far as the other items on the list are concerned, and also the items of work to be done which was prepared by the City of New Bedford, I find that the final assessment of the work needed to be done according to the Authority came in a letter of December 8, 1978 to Federico from Horn. That list only discussed the previous paving work which Horn and the Authority had already agreed was complete and for which I have already found that Federico is not responsible. The other non-paving items were not included on the December 22, 1977 final punch list and would appear to be claims for either breach of warranty or for defective workmanship which, under the contract, survived for a one-year period.[11] Since the contracts were substantially completed in 1975 and 1976, December 8, 1978 is too late for these claims to have been made and there is no responsibility on the part of Federico or its surety for those items. Federico was not an unlimited guarantor of all potential and future problems. All things must come to a reasonable end and that is contemplated by M.G.L. Ch. 30, Section 39G. Presumably, this letter of December 22, 1977 contained all that the Authority still felt was undone by Federico and waived all other claims, and I so find. The Authority cannot now, almost two years later, claim other items needed to be done as well.

█ Since the Authority failed to provide final lists and final payments, it would normally be required to pay interest on the amounts improperly withheld, beginning 30 days after the date of substantial completion pursuant to M.G.L. Ch. 30, Section 39G. Although the Authority was enjoined from paying any monies to the Debtor, by Order of the Norfolk Superior Court on April 5, 1978, they could have and should have made payments to Federico prior to that date on all disputed items. While it is true that a bonafide dispute arose between the parties, that dispute only concerned extras for which the Authority would have had to pay additional money not covered by any money it withheld from Federico. Therefore, subject to the trial on damages, I find that the Authority is required to pay interest pursuant to M.G.L. Ch. 30, Section 39G on the monies due Federico, starting 30 days after the dates of substantial completion of the jobs, to April 4, 1978.

*CONCLUSION*

On Counts I, II, III, and V of the South and North Terminal projects, and Counts I, II, III and VI of the West End project, all claims for extra fittings, I find for the Authority.[12] On Count IV of the West End project, the scribner's error, I find for the Authority. On Count IV of the South and North Terminal projects and Count V of the West End project, I find that Federico is entitled to final measurements, final payments and retainage on all three projects with accrued interest, pursuant to M.G.L. Ch. 30 Section 39G from 30 days after the dates of substantial completion of the three jobs to April 4, 1978. The Authority will be permitted to set-off amounts for the two items on the West End project on which Federico is still liable; namely, locating ten water service gates and installing four fire alarm pedestals. The amount of these set-offs will be determined during the trial on damages.

A pre-trial on the damage aspect will be held on *TUESDAY, FEBRUARY 17, 1981 at 11:00 A.M.* in Courtroom 1116.

### APPENDIX A

3. INSPECTION OF SITE

Each Bidder should visit the site of the proposed work and fully acquaint himself

---

11. Section 132 of the contracts provides, *inter alia*, the Contractor shall promptly remedy any defects in the work and pay for any damage to other work resulting therefrom which shall appear within a period of 12 months from the date of final acceptance of the work. The Local Public Agency will give notice of defective materials and work with reasonable promptness.

12. After having prepared its opinion in this case, the Court noted a supporting opinion of the Massachusetts Appeals Court, *D. Federico Company, Inc. v. Commonwealth*, Mass.App. Ct.Adv.Shs. 184, -- Mass.App. ---, 415 N.E.2d 855 (1981).

with the existing conditions there relating to construction and labor, and should fully inform himself as to the facilities involved, the difficulties and restrictions attending the performance of the Contract. The Bidder should thoroughly examine and familiarize himself with the Drawings, Technical Specifications, and all other Contract Documents. The Contractor by the execution of the contract shall in no wise be relieved of any obligation under it due to his failure to receive or examine any form or legal instrument or to visit the site and acquaint himself with the conditions there existing and the Local Public Agency will be justified in rejecting any claim based on facts regarding which he should have been on notice as a result thereof.

### 414. INTERFERENCE WITH EXISTING UTILITIES

The location of existing underground utilities as shown on the Drawings is approximate only and is shown only for the convenience of the Contractor, who must verify the information to his own satisfaction.

The Contractor shall be held responsible for the cost of repairing all utilities, whether shown on the Drawings or not, when such become damaged due to the construction operations of the Contractor. It shall be the Contractor's responsibility to notify all utility companies before the start of the work. No valve, switch or other control on existing utility systems shall be operated for any purpose by the Contractor without approval of the utility.

Location of all underground utilities which may be encountered during the course of construction is the responsibility of the Contractor. It is his duty to locate existing utilities such as water, gas, sanitary and storm sewers, subsurface drains, telephone and electric conduits and poles and the like. He shall locate underground structures or arrange with the owners of them to assign a representative to indicate their location. All costs, including the costs of the services of the abovementioned representatives, incurred in such location operations shall be borne by the Contractor.

In addition to the above, the Contractor will be responsible for scheduling his operations to avoid interruption to local services. When interruption is unavoidable, it shall be done only with the approval of the Engineer and the utility companies or departments involved, and under the restrictions the Engineer shall impose.

Under no circumstances shall the Contractor cause an interruption of water service to New Bedford Gas and Edison Light Company. The Contractor is put on notice that the water services from the main on Water Street to New Bedford Gas and Edison Light Company essential to that company's operations, and the Contractor will be fully liable for any consequential damage resulting from curtailing water service to that company. The Contractor fully guarantees to reimburse all claims which the Local Public Agency is required to pay by reason of any action by the Contractor which results in curtailment of water service.

*13.3.4 Existing Structures and Facilities:* The location of existing underground utilities and structures as shown on the Drawings is approximate only and is shown only for the convenience of the Contractor, who must verify the information to his own satisfaction.

The Contractor shall be held responsible for the cost of repairing all utilities, structures and subsurface drains, whether shown on the Drawings or not, when such become damaged due to the construction operations of the Contractor. It shall be the Contractor's responsibility to notify all utility companies before the start of the work. No valve, switch or other control on existing utility systems shall be operated for any purpose by the Contractor without approval of the utility owning it.

Location of all underground structures which may be encountered during the course of construction is the responsibility of the Contractor. It is his duty to locate existing utilities such as water, gas, sanitary and storm sewers, subsurface drains, telephone and electrical conduits and poles

and the like. He shall locate underground structures or arrange with owners of them to assign a representative to indicate their location. All costs including the costs of the services of the above mentioned representatives, incurred in such location operations shall be borne by the Contractor.

Should it become necessary to change the position, or temporarily remove any electric conduits, water pipes, gas pipes, or other pipes or structures, in order to permit the Contractor to use a particular method of construction or in order to obtain clearance for the pipe being built, the Contractor shall notify the Engineer of the location and circumstances and shall cease work if necessary, until satisfactory arrangements have been made by the owners of the said pipes, wires, or structures to properly care for the same. No claims for damages will be allowed on account of any delay occasioned thereby. Additional compensation shall be expressly limited to additions in the work due to changes in alignment and grade as specified in Section 13.3.5 "Alignment and Grade". The Contractor shall, at his own expense, shore up and protect any buildings, poles, bridges, or other public or private structures which may be encountered or endangered in the prosecution of the work, and that may not be otherwise provided for, and he shall repair and make good any damages caused to any such property by reason of his operations. No extra payment will be made for said work or material.

*13.3.5 Alignment and Grade*: All construction shall conform to the required lines and grades. No deviation shall be made from the required line or grade except with the written consent of the Engineer. Wherever obstructions not shown on the Drawings are encountered during the progress of the work and interfere to such an extent that an alteration of the line and/or grade results in work beyond that required by the Contract Documents, Compensation for such additional work will be made as specified in Item 109—CHANGES IN THE WORK—GENERAL CONDITIONS. Unauthorized deviations from the

lines and grades shown on the Drawings or established by the Engineer shall be corrected at the expense of the Contractor.

1. LOCATION OF EXISTING UTILITIES IS APPROXIMATED, AND IS BASED ON THE BEST INFORMATION AVAILABLE. LOCAL CONNECTIONS ARE NOT SHOWN. THE CONTRACTOR IS FULLY RESPONSIBLE FOR LOCATING ALL UTILITIES WHETHER SHOWN ON THE DRAWINGS OR NOT, AND IS FULLY LIABLE FOR ANY DAMAGE THERETO. ADDITIONAL COMPENSATION FOR ERRORS AND OMISSIONS IN THE LOCATION OF UTILITIES AS SHOWN ON THE DRAWINGS WILL BE ALLOWED ONLY AS SPECIFIED IN THE SPECIFICATIONS.

## APPENDIX B

### 9. UNIT PRICES

The unit price for each of the several items in the proposal of each Bidder shall include its prorata share of overhead so that the sum of the products obtained by multiplying the quantity shown for each item by the unit price Bid represents the total Bid. Any Bid not conforming to this requirement may be rejected as informal. The special attention of all Bidders is called to this provision, for should conditions make it necessary to revise the quantities, no limit will be fixed for such increased or decreased quantities nor extra compensation allowed, provided the net monetary value of all such additive and subtractive changes in quantities of such items of work (i.e., difference in cost) shall not increase or decrease the original contract price by more than twenty-five (25) per cent, except for work not covered in the Drawings and Technical Specifications as provided for in Section 109—CHANGES IN THE WORK under GENERAL CONDITIONS PART 1.

*13.5.2 Fittings and Adaptors*: No separate payment will be made for any fittings and adaptors required for or forming a part of the work called for by the drawings, these specifications or other Contract Documents, but the cost thereof shall be included by the Contractor in the item or items in

the BID FOR SITE IMPROVEMENTS covering the particular parts of the work.

## 109.  CHANGES IN THE WORK

a. The Local Public Agency may make changes in the scope of the work required to be performed by the Contractor under the Contract or make additions thereto, or by omitting work therefrom, without invalidating the Contract, and without relieving or releasing the Contractor from any of his obligations under the Contract or any guarantee given him pursuant to the Contract provisions, and without affecting the validity of the guaranty bonds, and without relieving or releasing the surety on sureties of said bonds.  All such work shall be executed under the terms of the original Contract unless it is expressly provided otherwise.

b. Except for the purpose of affording protection against any emergency endangering life or property, the Contractor shall make no change in the materials used or in the specified manner of constructing and/or installing the improvements or supply additional labor, services or materials beyond that actually required for the execution of the Contract, unless in pursuance of a written order from the Local Public Agency authorizing the Contractor to proceed with the change.  No claim for an adjustment of the Contract Price will be valid unless so ordered.

c. If applicable unit prices *are* contained in the Agreement (established as a result of either a unit price bid or a Supplemental Schedule of Unit Prices), the Local Public Agency may order the Contractor to proceed with desired changes in the work, the value of such changes to be determined by the measured quantities involved and the applicable unit prices specified in the Contract; provided that in case of a unit price contract the net value of all changes does not increase or decrease the original total amount shown in the Agreement by more than twenty-five per cent (25%) in accordance with the section entitled UNIT PRICES under INSTRUCTIONS TO BIDDERS.

d. If applicable unit prices *are not* contained in the Agreement or if the total net change increases or decreases the total Contract Price more than twenty-five per cent (25%), the Local Public Agency shall, before ordering the Contractor to proceed with desired changes, request an itemized proposal from him covering the work involved in the change after which the procedure shall be as follows:

(1) If the proposal *is acceptable* the Local Public Agency will prepare the change order in accordance therewith for acceptance by the Contractor, and

(2) If the proposal *is not acceptable* and prompt agreement between the two parties cannot be reached, the Local Public Agency may order the Contractor to proceed with the work on a cost-plus-limited basis.  A cost-plus-limited basis is defined as the net cost of the Contractor's labor, materials and insurance plus fifteen per cent (15%) of said net cost to cover overhead and profit, the total cost not to exceed a specified limit.

e. Each change order shall include in its final form:

(1) A detailed description of the change in the work.

(2) The Contractor's proposal (if any) or a conformed copy thereof.

(3) A definite statement to the resulting change in the contract price and/or time.

(4) The statement that all work involved in the change shall be performed in accordance with contract requirements except as modified by the change order.

## 110.  CLAIMS FOR EXTRA COST

a. If the Contractor claims that any instructions by Drawings or otherwise involve extra cost or extension of time, he shall, within ten days after the receipt of such instructions, and in any event before proceeding to execute the work, submit his protest thereto in writing to the Local Public Agency, stating clearly and in detail the basis of his objections.  No such claim will be considered unless so made.

b. Claim for additional compensation for extra work, due to alleged errors in ground elevations, contour lines, or bench marks, will not be recognized unless accompanied by certified survey data, made prior to the time the original ground was disturbed, clearly showing that errors exist, which resulted, or would result, in handling more material, or performing more work than would be reasonably estimated from the Drawings and maps issued.

c. Any discrepancies which may be discovered between actual conditions and those represented by the Drawings and maps shall at once be reported to the Local Public Agency and work shall not proceed except at the Contractor's risk, until written instructions have been received by him from the Local Public Agency.

d. If, on the basis of the available evidence, the Local Public Agency determines that an adjustment of the Contract Price and/or Time is justifiable, the procedure shall then be as provided in Section— CHANGES IN THE WORK under GENERAL CONDITIONS, PART 1.

113. DISPUTES

a. All disputes arising under this Contract or its interpretation except those disputes covered by FEDERAL LABOR– STANDARDS PROVISIONS under GENERAL CONDITIONS, PART II, whether involving law or fact or both, or extra work, and all claims for alleged breach of contract shall within ten (10) days of commencement of the dispute be presented by the Contractor to the Local Public Agency for decision. All papers pertaining to claims shall be filed in quadruplicate. Such notice need not detail the amount of the claim but shall state the facts surrounding the claim in sufficient detail to identify the claim, together with its character and scope. In the meantime the Contractor shall proceed with the work as directed. Any claim not presented within the time limit specified within this paragraph shall be deemed to have been waived, except that if the claim is of a continuing character and notice of the claim is not given within ten days of its commencement,

the claim will be considered only for a period commencing ten (10) days prior to the receipt by the Local Public Agency of notice thereof.

b. The Contractor shall submit in detail his claim and his proof thereof. Each decision by the governing body of the Local Public Agency will be in writing and will be mailed to the Contractor by registered mail, return receipt requested.

c. If the Contractor does not agree with any decision of the Local Public Agency, he shall in no case allow the dispute to delay the work but shall notify the Local Public Agency promptly that he is proceeding with the work under protest and he may then except the matter in question from the final release.