In re D. FEDERICO CO., INC., Debtor.

D. FEDERICO CO., INC., Plaintiff,

v.

NEW BEDFORD REDEVELOPMENT AUTHORITY, Defendant.

Bankruptcy No. 79–2289–HL.
Adv. Nos. 80–0124 to 80–0126.

United States Bankruptcy Court, D. Massachusetts.

Aug. 19, 1981.

See also, Bkrtcy., 8 B.R. 888.

Lewis C. Eisenberg, Quincy, Mass., for plaintiff.

Allen H. Roffman, Chelsea, Mass., trustee.

Raymond A. Letourneau, New Bedford, Mass., for defendant.

MEMORANDUM AND FINDINGS ON DAMAGES

HAROLD LAVIEN, Bankruptcy Judge.

The Plaintiff in these three cases, D. Federico Co., Inc., a general contractor, was

---

awarded five public contracts by the Defendant, the New Bedford Redevelopment Authority (hereinafter, the Authority) involving the construction of storm drainage, sanitary sewers, water mains, curbs, sidewalks, new pavement, pavement resurfacing and other related work. The contracts presently before the Court are the South Terminal Urban Renewal Project (hereinafter, South Terminal Project), North Terminal Urban Renewal Project (hereinafter, North Terminal Project), and West End Urban Renewal Project (hereinafter, West End Project).

The trial on these three cases was bifurcated. This Court's decision on liability was rendered on February 3, 1981. See Memorandum on Prospective Liability (*D. Federico Co., Inc. v. New Bedford Redevelopment Authority* [February 3, 1981, D.Mass., Lavien, B. J.]), 8 B.R. 888. That decision left as issues for the damages portion of the trial the figures as to final measurements and the corresponding final payments, with accrued interest, to be paid to the Plaintiff. Also to be determined was the amount of set-off the Authority was to be allowed for two items which the Plaintiff did not perform on the West End Project, namely, locating ten water service gates and installing four fire alarm pedestals. The amount of this set-off was subsequently stipulated to by the parties as $1,400, and I so find.

The evidence on damages claimed by the Plaintiff focused on three claims: first, for final measurements and payments, including retainages, on each project; second, for the quantity of borrow used on the South Terminal Project in excess of the amount shown for that line item by the Defendant's resident engineer; and, third, for payment of the field office line item contained in the bid and contract for each of the three projects. In addition, Plaintiff is entitled to interest.

## I. *Final Measurements and Payments*

The Plaintiff contends that payment should be based on figures prepared for each project by Anton Brockelman, resident engineer of the Authority. It was Brockelman's responsibility as the Authority's resident engineer to monitor job progress, and prepare monthly pay estimates, and final punch lists and measurements. Brockelman testified that he was directed in December 1978 by the Authority's Executive Director to have final measurements prepared on all three projects by the time his position with the Authority was to terminate, the 31st of January, 1979. The figures set out in Exhibit D2 for the West End Project, set out in Exhibit D3 for the South Terminal Project and captioned "final", and set out in Exhibit D5 for the North Terminal Project and captioned "semi-final" were prepared by Brockelman in response to the Executive Director's order and, the Plaintiff asserts, should be binding on the Authority as its own work product.[1] That the figures were not in final form was due to the termination of the entire engineering staff in early 1979 before their work was completed and checked. The Authority caused whatever confusion existed and must suffer the consequences.

The Authority states that it is ready to compensate the Plaintiff for work actually performed except that as a practical matter, it does not know exactly what that work was. It is the Authority's position that it has never accepted Brockelman's South Terminal and North Terminal figures[2] and, therefore, it cannot be bound to these figures. The Authority asserts that Brockelman's figures are inflated. It focuses its attack on eight line items in Brockelman's South Terminal document and eight line items in Brockelman's North Terminal document. In addition, the Authority in-

1. The West End figures as set forth in Exhibit D2 have been accepted by the Authority as the final measurements with the exception of the field office line item.

2. The document provides for signatures by the Authority's resident engineer (Anton Brockel-

man), project manager (Manuel Viveiros), executive director, and by D. Federico Co. The South Terminal document was signed by Brockelman and Viveiros. The North Terminal document was signed by Brockelman only.

troduced evidence that certain items were not billed under the proper line items, and evidence of discrepancies between figures found on Brockelman's work papers and the final figures he listed.

The Authority had a contractual obligation to provide the Plaintiff with a punch list, final inspection, and final measurements. Moreover, the Authority was aware from at least 1977 that it was in dispute with the Plaintiff and, yet, neither Brockelman nor any other engineer was retained on the payroll long enough to compute final measurements, and the Authority did nothing for two years after the discharge of its engineers and, in fact, even through the time of trial, to engage competent personnel to conclude the contracts. While Brockelman's reports were not fully verified measurements,[3] except where there is evidence to support a variation of a specific amount from Brockelman's figure on a line item, the Court adopts the statement in the Authority's brief that it "reluctantly" accepts those Brockelman line item figures that it did not attack during the trial.

As to the challenged line items, the Court was left at the conclusion of the evidence with very few additional numbers to those prepared by Brockelman and, thus, could neither determine that Brockelman was in the main accurate or, in the alternative, determine the specific numbers for specific line items that should be substituted for Brockelman's numbers. For this reason, the Court sua sponte suggested to the parties, after both sides had concluded their evidence and rested, that they jointly take field measurements or a representative sample of disputed, but easily measured, line items.

Unfortunately, the parties subsequently could only agree on joint measurement of three line items and even this agreement later fell apart as to two of the three. Each party then, at the Court's further request, took independent measurements on certain line items each had selected.

The evidence presented to the Court as a result of these field measurements was typical of the problems facing the Court in ascertaining the facts in this proceeding. The evidence presented on the number of concrete foundations (line item # 64 of the North Terminal Project) installed by the Plaintiff demonstrates how what should have been a simple counting requiring no expertise becomes muddled. The plans show that 55 concrete foundations are required as street light bases. The Defendant introduced photographs showing that only one street light foundation was installed on a section of street where the plans called for six concrete foundations for lights. The reasonable conclusion is that the Plaintiff installed no more than 50 of the required 55 street light foundations. However, the defendant's witness, Norman Daigle, testified that he actually counted 52 street light foundations.

Despite confusing evidence of this nature, the Court must make findings, and so, after careful review of the record, as it is, the Court makes the findings below as to final measurements and payments on the disputed line items. Since the Court's ultimate responsibility in this portion of the trial is to determine the precise dollar amount owing between the parties, these findings on final measurements must be translated into dollar amounts. As a point of departure, the dollar figures shown for "Total Value of Work Done to Date" reported by the Authority's resident engineer (Brockelman) on Exhibit D2 for the West End project, on Exhibit D3 for the South Terminal project, and on Exhibit D5 for the North Terminal project, are adopted. (Neither party disputes the document except as to the accuracy of figures listed for various line items.) Where the figure that the Court finds on a disputed line item is less than the figure Brockelman had listed for that line item, the "Total Value" figure for that project is to be reduced in the stated amount.

---

**3.** Brockelman testified that the two months allotted to him for completion of final measurements for each of these three contracts, plus

the piers and wharves contract, was not adequate.

## NORTH TERMINAL

(a) Line Item # 64: Concrete foundations

I find the final figure to be 58. Concrete foundations are an item that could be readily counted. The Authority's witness, Norman Daigle, a draftsman employed by the Authority, walked the project with the plans and counted 58 bases, 52 for lights and six for fire alarm bases. The Authority introduced a photograph suggesting the absence of five foundations for street lights. Brockelman's figure was 62, 55 bases for lights and seven for fire alarm boxes. In the absence of any explanation as to why his figure differed from the number actually observed, I accept the Authority's figure of 58. This finding reduces the amount owed to the Plaintiff for line item # 64 by $1,160.

(b) Line Items # 3 and # 6: 18" and 36" Reinforced Concrete Pipe (R.C.P.)

I find the final figures to be 2471 linear feet (l.f.) and 1506 l.f., respectively, the figures Brockelman reported. Brockelman was aware that R.C.P. was to be measured from manhole wall to manhole wall, i. e., excluding the manhole diameters.[4] That his calculation did not include the diameter is suggested by the fact that his figure on 36" R.C.P. (1506 l.f.) is considerably less than the measurement made jointly (1538 l.f.) by representatives of Federico and the Authority on May 15, 1981, who measured from center of manhole to center of manhole. The draftsman employed by the Authority prepared, subsequent to May 15, 1981, measurements that excluded the manhole diameters and these measurements, 2047 l.f. and 1485.5 l.f., respectively, were less than Brockelman's measurements. However, because of the draftsman's lack of expertise in field measurements, a natural bias on his part, and the difficulty of

measuring or estimating underground installations, I accept Brockelman's figures.

(c) Line Items # 13 and # 15: 8" and 15" Vitrified Clay Pipe (V.C.P.)

I find the final figure on the 8" V.C.P. to be 1890 l.f., Brockelman's figure, again because I conclude that Brockelman was aware of the proper method of measuring V.C.P. and was considerably more experienced with preparation of final figures than was the Authority's witness.

As to the 15" V.C.P., I find that the final figure is 2253 l.f., Brockelman's figure, but that 247 l.f. of this figure should be reduced by $2.51 per linear foot. This 247 l.f. was measured by the Department of Public Works as 12" V.C.P. and, therefore, the Authority is entitled to the difference between the cost of 12" and 15" V.C.P. I find the installation costs for 12" and 15" V.C.P. to be the same. There was no evidence that the 247 linear feet of 12" V.C.P. had been included in line item # 10. This finding as to line item # 6 reduces by $619.97, the amount shown on Exhibit D5 as due the Plaintiff.

Like line item # 6, # 16 was a line item for which a joint measurement was taken and that joint measurement (2303 l.f.), exceeded Brockelman's figure of 2253 l.f. This, again, suggests that Brockelman was mindful of the requirement in the contract specifications that linear footage include only manhole wall thickness and not the entire diameter of the manhole.

(d) Line Item # 24: 6" Cast Iron Pipe (C.I.P.)

Brockelman's notes and semi-final figures show 490 linear feet. I find that 250 l.f. of the 490 l.f. was paid under line item # 26, a lump sum line item for the pump station, as required by section 15.3[5] of the Techni-

---

4. See May 7, 1981 Transcript of Trial at p. 48.

5. Subsection 15.3 reads as follows:

   Basis of Payment: Payment for Pump Station will be made at the lump sum price in

the BID PRICE FOR SITE IMPROVEMENTS. The lump sum price shall include everything necessary to install and make operational this pump station, including but not limited to the following; excavating, concrete, backfill, force main, inlet lines from manhole, ser-

cal Specifications. Brockelman identified the 250 l.f. as force main and, upon review of section 15.3, conceded that he had made a mistake in putting that footage under line item # 24. Subtracting the 250 l.f. from line item # 24 at a unit price of $25. per linear foot reduces by $6,250. the amount shown on Exhibit 5 as due the Plaintiff.

I find that an additional 32 l.f. is 4″ C.I.P. rather than 6″ C.I.P. Since there was no evidence that 4″ was not the proper size for that section of pipe or of any detriment to the water system caused by using 4″ pipe in that 32 ft. section, I find that the Plaintiff should be compensated for that 32 l.f. of C.I.P. There is no line item in the contract for 4″ C.I.P. but, based on the testimony of John Capacefalo, I find that installation costs are the same for 4″ and 6″ C.I.P. and that the difference in materials cost is 23 cents per linear foot. This finding reduces by $7.36 the amount shown on Exhibit D5 as due the Plaintiff.

(e) Line Item # 27: 12″ C.I.P.

I find that the final figure is Brockelman's figure of 3761 l.f. Daigle, the Authority's draftsman, measured 3103.3 l.f. measuring in a straight line from gate valve cover to gate valve cover. Because C.I.P. is used in a pressurized (water) system it can, and did, in the contracts here, make turns around underground obstructions. Consequently, measurements in a straight line will under-estimate the linear footage of pipe used. Moreover, Leo Strahoska, a junior engineer with the New Bedford Water Department and a 20-year employee of that Department, testified that Water Department employees observed the installation of the South Terminal water service and kept daily notes on the pipe and fittings installed and the location thereof. From these notes, Strahoska prepared maps of the system. The Water Department's methodology seems fairly similar to Brockelman's record-keeping and would appear to have taken proper account of the turns and twists of the pipe and thus to have produced records that would be valuable for challenging Brockelman's figures. Yet, the Authority failed to make use of these records to refute Brockelman's numbers on C.I.P. and, instead, chose to rely on the above ground measurements of their draftsman.

(f) Line Item # 31: 6″ Underground Gate Valves

This item was susceptible to above ground verification by checking for gate boxes. The valves also appeared on Strahoska's maps of the water system. Strahoska, a person qualified to properly identify gate valves, and the Authority's draftsman did make a visual check, guided by Strahoska's maps, and identified three 6″ gate valves, and I so find. Since Brockelman reported an additional six units and the unit price is $250, the amount owed to the Plaintiff is reduced by $1,500.

## SOUTH TERMINAL

(a) Line Item # 6: 36″ Reinforced Concrete Pipe (R.C.P.)

The 36″ R.C.P. was used for two purposes: the "arterial" and a sleeve for waterpipe running underneath a highway. Brockelman's figure for this line item (445 l.f.) is not broken down into arterial footage and sleeve footage. For the sleeve, notes kept by the Water Department show 21 length of eight feet R.C.P. (168 l.f.) were used. The draftsman's "scaling" method produced a 160–170 l.f. measurement. A field measurement taken by the Plaintiff's project manager, John Capacefalo, was 222.5 l.f. Since the method of measurement Capacefalo used is unclear and the Authority's figures are consistent with each other and the methodology employed seems appropriate, I find that the linear footage for the sleeve is 168 l.f.

To this figure, should be added 241 l.f. for the arterial footage, for a total of 409 l.f. Brockelman did not provide a separate fig-

vice pole, meter box, alarm, high water alarm switch, conduits, connections for power and all labor and tools.

(NOTE: This section follows section 15.22 and apparently was intended to be numbered 15.-23.)

ure for the arterial. The arterial measurement taken jointly by the parties (251 l.f.) included the manhole diameter and, therefore, must be disregarded. The measurement taken by the Authority's draftsman (241 l.f.) excludes manhole diameters and is accepted as the soundest figure presented to the Court as to the arterial pipe footage. Brockelman's 445 l.f. total having been reduced by 36 l.f. to 409 l.f., the amount owed the Plaintiff is reduced by 36 times the unit price of $86., that is, $3,096.

(b) Line Item # 9: 54″ Reinforced Concrete Pipe (R.C.P.)

Brockelman's final figure is 58 l.f., and I so find. His diary entries are based on the number of eight foot lengths used and show 56 l.f. As found in the R.C.P. line items under North Terminal, Brockelman was aware of the requirement that measurements be taken from manhole wall to manhole wall. The additional two feet could well be footage taken up by fittings. As described in the liability portion of the trial, fittings are paid for under the pipe line items through the additional footage they produce.

The draftsman's measurement is not adopted for the general reasons stated under line items # 6 and # 16, North Terminal.

(c) Line Item #10: 60″ R.C.P.

Brockelman's figure is 690 l.f. and I find that figure to be the final measurement. Although this figure exceeds the total of Brockelman's handwritten file notes by 4 l.f., and exceeds the draftsman's field measurement by 23 l.f., these discrepancies are adequately explained by the factors described under the immediately preceding line item.

(d) Line Item #27: 12″ Cast Iron Pipe (C.I.P.)

I find the final measurement to be Brockelman's figure of 1165 l.f. The reason for accepting this figure rather than that offered by the Authority's draftsman (1102.2 l.f.) is the same as that described above for the 12″ C.I.P. line item in the North Terminal contract.

(e) Line Item # 32: 8″ Underground Gate Valves

The Authority's figure of five is accepted. As stated under the discussion of line item # 31 of the North Terminal contract, this item was susceptible to above ground verification and was verified by a Water Department employee qualified to properly identify gate valves. Reducing the ten units Brockelman listed to five at a unit price of $500. reduces the amount owed to the Plaintiff by $2,500.

(f) Line Items # 40 and # 47: Rock Excavation and Pavement

Brockelman's final figures were 1231 cubic yards (c.y.) for rock excavation and 155 tons for pavement. The Authority's attack on these figures consisted of testimony from Brockelman that totalling the figures on his handwritten notes found in his files as presented to him in the courtroom, amounted to 1044.09 cubic yards and 57.3 tons, respectively. Brockelman asserted that the inconsistencies were due to the fact that the files as presented to him in court were not complete. Since the witness insisted that there were explanations for the discrepancies, since the burden was on the Authority to show that the records in its exclusive possession had not been tampered with, since over two years had passed since the witness had seen his files and, therefore, could be expected to need time to reconstruct the basis of each figure, and since the Authority failed to provide any positive evidence of what the number on the rock excavation and pavement line items should be, I find Brockelman's figures of 1231 cubic yards and 155 tons to be the final figures.

II. *Borrow* (Line Item #39, South Terminal)

The Plaintiff is seeking payment for 17,710 c.y. of borrow beyond the 28,885 c.y. reported by Brockelman as his final estimate. The Plaintiff attempts to substanti-

ate its request in an unusual way. John Capacefalo, the Plaintiff's project manager, testified that the supplier's bills showed deliveries of 69,198 c.y. of borrow.[6] From this amount Capacefalo subtracted (1) cubic yards used and compensated under other line items (15,683 c.y.), (2) the amount Brockelman reported in his final estimate (28,885 c.y.) and (3) ten percent shrinkage factor (6920). This computation left a difference of 17,710 c.y. which the Plaintiff contends represents the difference between borrow utilized at the site and payment pursuant to Brockelman's figures.

The Court agrees that the Plaintiff is entitled under the contract to payment for actual quantities used in completion of the South Terminal project,[6a] but finds the Plaintiff's analysis troublesome in several respects. First, the Plaintiff has no records and, according to Capacefalo, kept no records that would show where the truckloads of borrow were being utilized. The evidence was limited to testimony that the borrow was not stockpiled but, rather, was used as it was delivered in the various aspects of the project that then required borrow under line item # 38.[7]

Second, and directly related to the absence of any records, is the fact that the 17,710 c.y. figure not only is without a positive basis of support, but is a figure that the Plaintiff backs into after making several estimates of borrow used under other line items. Because of the inverse relationship between these estimates and the number for which compensation is sought, it is to the Plaintiff's advantage to minimize the allocation of borrow to line items other than # 39.

A third troublesome matter is the Plaintiff's failure to bring to the Authority's attention upon receipt of apparently seriously underestimated monthly estimates, the deficiency in line item # 39. Brockelman testified that, although cross sections were to be used for final measurements, truck load receipts were used for monthly pay estimate purposes. If the Authority was not crediting Federico for substantial amounts of borrow, the Plaintiff should have readily detected this fact through the monthly pay estimates and would have been expected to have sought a current correction.

The alternative to the Plaintiff's backward analysis is Brockelman's figure for line item # 39. Brockelman testified that this figure was derived by computing cross sections. This is the method prescribed in Section 5 of the Technical Specifications, the section of the contract specifications dealing with borrow.[8]

Moreover, since the Plaintiff has not objected to the figures Brockelman computed for the borrow line item in the North Terminal or West End contracts, it would appear that Brockelman's method proved satisfactory there as well as everywhere else on the three projects. The Plaintiff's case is built on the accuracy of Brockelman's figures. As noted, no complaint about a deficiency in Brockelman's numbers for borrow was made until this litigation and, if there were special circumstances in the South Terminal contract that made the utilization of borrow difficult for the Authority to verify, the Plaintiff failed to take any reasonable steps such as simple records of where truckloads of borrow were being deposited, to protect itself. On line item # 39, I find that the

---

**6.** It is noted, however that when Capacefalo was asked by Defendant's counsel to total the cubic yards of borrow shown on the Garceau bills in evidence, Capacefalo found the total to be 26,515 c.y. No explanation was offered by the Plaintiff.

**6a.** *D. Federico Co., Inc. v. Commonwealth,* —— Mass.App. ——, 415 N.E.2d 855, 1980.

**7.** The location is important because at the time certain pay estimates were prepared in 1974

and 1975 showing deliveries of borrow, the need for borrow was in the North Terminal project rather than South Terminal project, suggesting that the Authority may be paying twice for certain deliveries.

**8.** Subsection 5.4 reads as follows:

*5.4 Method of Measurement*—it will be paid as the number of cubic yards accepted and in place in embankment using cross-sections.

final measurement is Brockelman's figure of 28,885 c.y.

## III. *Field Offices*

In each of the contracts there was a line item for a field office and that line item was bid at a lump sum: South Terminal, Line Item # 86, $5,000; North Terminal, Line Item # 72, $100; West End, Line Item # 65, $3,000. In each contract the line item has neither been paid nor deleted and Plaintiff claims full payments are due.

The evidence on this item was less than optimum. It does not seem disputed that Federico had placed a trailer "on the pier". The Plaintiff's counsel referred to this trailer as "... Federico's field office where he kept his records".[9] This wording illustrates the weakness in the evidence. There is no evidence of what, if anything, was made available to the Authority in the way of work space, storage and security for records, privacy, or even the location's accessibility to the actual work sites. Clearly, the trailer was not located on any of the projects. Brockelman, whether from choice or otherwise, did not use the trailer and, in fact, on the West End project used his truck as his field office.

The Authority cannot avoid payment of a line item by simply refusing to accept tendered performance, but here there is no evidence to support any conclusion other than that the trailer provided office space for the Plaintiff. And, such being the case, that expense is properly allocable to overhead and not as a direct charge to the Authority. I find that the Plaintiff has not rendered performance of the field office line item for any of the projects in issue here, though that may be a proper item on the piers contract and, therefore, no payments are due to the Plaintiff on the field office line items.[10]

## IV. *Summary*

The Plaintiff is entitled to payments from the Authority in the following amounts:

**9.** May 7, 1981 Transcript of Trial at p. 95.

**10.** See *D. Federico Co., Inc. v. New Bedford Redevelopment Authority*, 1980, —— Mass.App.

### A. West End

| | |
|---|---|
| Final payment figures (based on Exhibits D2 & D12) | $27,735.80 |
| Less set-off | ( 1,400.00) |
| | $26,335.80 |
| | + Interest |

### B. North Terminal

| | |
|---|---|
| Final payment figure (based on Exhibit D5) | $35,034.62 |
| Less deductions based on Court's findings | ( 9,537.33) |
| | $25,497.29 |
| | + Interest |

### C. South Terminal

| | |
|---|---|
| Final payment figure (based on Exhibit D3) | $38,131.54 |
| Less deductions based on Court's findings | ( 5,596.00) |
| | $32,535.54 |
| | + Interest |

Interest on the total amount for each project is to be computed in accordance with section V below.

## V. *Interest*

The penalty interest provided by Mass. Gen.Laws Ch. 30, § 39G is assessed on the total amount due on each project, except as limited by the injunction, since the Authority did not dispute payment on any of the line items where findings went against them until some considerable time after a final estimate was due. The policy objective of Mass.Gen.Laws Ch. 30, § 39C is prompt payment of undisputed amounts which cannot be avoided by failure to provide a final punch list or final measurements.[10]

At the trial on liability, the Court found that the Plaintiff was entitled to accrued interest pursuant to Mass.Gen.Laws Ch. 30, § 39G from 30 days after the dates of substantial completion of the three projects through April 4, 1978. The dates of substantial completion were found to be April 1975 for the South Terminal project and May 1976 for the North Terminal and West End projects. April 4, 1978 was determined to be the last date for which interest was

————, 415 N.E.2d 855, Mass.App.Ct. Adv.Sh. 203–4.

due because on April 5, 1978, the Norfolk Superior Court had enjoined the Authority from making payments to the Plaintiff.

The Court's ruling on interest is amended in two respects: First, interest will accrue commencing the sixty-sixth day after the dates of substantial completion.[11] That is, interest commences on June 6, 1975 for the South Terminal project and on July 6, 1976 for the North Terminal and West End projects. Second, because the injunction entered on April 5, 1978 only enjoined payments by the Authority up to $70,000., a figure less than that for which the Authority was found to be indebted, and because on April 25, 1978, the injunction was amended to reduce the dollar amount to $54,500., this Court's ruling on interest is amended to allow interest to run, on the amount owed the Plaintiff in excess of the enjoined amounts, to the date of payment.[12]

Exhibit D–1 captioned "Interest Pursuant to G.L. Ch. 30 § 39G", a computation of the applicable penalty interest schedule to which the parties have stipulated, will govern the interest to be assessed for the time periods listed thereon. For additional time periods, the Plaintiff shall compute the penalty interest by reference to the governing Letter No. 8A published by the Federal Reserve Bank of Boston from time to time. Further, the Plaintiff shall compute the actual dollar amount of penalty interest due on the damage figures as found in this Memorandum. Within 15 days of the date of this Memorandum, the Plaintiff shall prepare the Judgment and Order on Damages. A copy shall be provided the Defendant who shall have 10 days to file any objections or revisions thereto.

VI. *Distribution of the Sum Awarded the Plaintiff*

The Authority is to turn over to the Trustee of D. Federico Co., Inc. the money awarded to D. Federico Co., Inc. by this decision. The Trustee is to deposit this sum in an interest-bearing account pending further Order of this Court regarding the allocation of this fund among the contesting parties. To the extent that payment to the Trustee may be in conflict with the restraining order of the Norfolk Superior Court entered prior to that case being removed to this Court, that injunction is lifted; however, any rights that Simeone obtained by virtue of the injunction will continue as if the injunction applied to the funds in the hands of the Trustee.

---

11. The 1976 revision of section 39G of Ch. 30, which adopts a thirty-day period, was explicitly made inapplicable to contracts executed prior to January 1, 1976. The contracts in issue were executed in 1973.

12. Because interest will run pursuant to Mass. Gen.Laws Ch. 30, § 39G from the statutory date to date of payment, except as to amounts the Authority is enjoined from paying, there is no need to deal with the Plaintiff's contention that Mass.Gen.Laws Ch. 231, § 6C becomes applicable.